```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA ex rel.                            :
ANDREW GELBMAN,                                             :
                                                            :
                              Plaintiff,                    :       14-CV-771 (VSB)
                                                            :
              - against -                                   :       **OPINION & ORDER**
                                                            :
                                                            :
                                                            :
THE CITY OF NEW YORK and NEW YORK                           :
CITY HEALTH AND HOSPITALS                                   :
CORPORATION,                                                :
                                                            :
                              Defendants.                   :
                                                            :
------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/30/2018

Appearances:

Richard Bradley Ancowitz
Law Office of Richard B. Ancowitz
Albany, New York
*Counsel for Plaintiff*

Stephen Edward Kitzinger
New York City Law Department
New York, New York
*Counsel for Defendant City*

Joseph Victor Willey
Alan J. Brudner
Elizabeth Darrow Langdale
Katten Muchin Rosenman, LLP
New York, New York
*Counsel for Defendants City and HHC*

VERNON S. BRODERICK, United States District Judge:

      Relator Andrew Gelbman ("Relator" or "Gelbman") brings this action under the *qui tam* provisions of the civil False Claims Act ("FCA"), which permit a private person to file an action on behalf of the Government. Before me are the motions of Defendants the City of New York

("City") and New York City Health and Hospitals Corporation ("HHC") to dismiss the second amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Because Relator fails to plausibly allege any type of false claim under the FCA and the second amended complaint otherwise fails to meet the pleading standard set forth in Rule 9(b), Defendants' motions are GRANTED.

I. **Background**

A. *Regulatory Background*

The Medicaid Act, enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, is a cooperative federal-state program designed to provide medical assistance to persons with insufficient resources to meet the costs of their necessary medical care. Although states are not required to participate in Medicaid, states that choose to do so must formulate a "state plan"—a plan of administration that complies with both the Medicaid Act and regulations promulgated by the United States Department of Health and Human Services ("HHS"). *See* 42 U.S.C. § 1396a. Federal Medicaid funds are made available to states that have such a state plan that has been approved by HHS. *See* 42 U.S.C. §§ 1396a(b), 1396b.

New York State participates in Medicaid pursuant to New York Social Services Law. Federal law requires states to designate a "single state agency" to administer the state plan. *See* 42 U.S.C. §§ 1396a(a)(4) & (5); 42 C.F.R. § 431.10(b). In New York the designated agency is the New York State Department of Health ("NYSDOH"). *See* N.Y. Pub. Health Law § 201(1)(v); N.Y. Soc. Serv. Law §§ 363-a(1)–(3). Among other responsibilities, NYSDOH "promulgates all necessary regulations and guidelines for [Medicaid] Program administration."[1]

---

[1] eMedNY Provider Manual, Information for All Providers, Introduction, "Forward," version 2011-1 (June 1, 2011), *available at* https://www.emedny.org/ProviderManuals/AllProviders/PDFS/Information_for_All_Providers-Introduction.pdf.

Although NYSDOH is primarily responsible for administering Medicaid in New York, some aspects of program administration are spread across other state agencies and local departments of social services. N.Y. Soc. Serv. Law §§ 365-n(2), (4). The five counties representing the City of New York share one local department of social services ("LDSS"). N.Y. Soc. Serv. Law § 61(1). LDSSs are responsible for denying or approving recipients' Medicaid eligibility applications and for determining Medicaid recipients' access to certain services. *See* N.Y. Soc. Serv. Law § 364(1)(a); N.Y. Comp. Codes R. & Regs. tit. 18, § 404.1.

Medical providers (*e.g.*, physicians, hospitals, or nursing homes) that wish to participate as providers in the Medicaid program must submit an enrollment application to NYSDOH and, if approved by NYSDOH, sign a provider agreement with the New York State. N.Y. Comp. Codes R. & Regs. tit. 18, §§ 504.2(b); 504.4(a), (e). Participating providers who furnish services to Medicaid recipients submit their claims for payment to NYSDOH. N.Y. Soc. Serv. Law § 367-b(2); N.Y. Comp. Codes R. & Regs. tit. 18, §§ 540.6(b), 635.1(a). Most providers submit their claims electronically through eMedNY, a software system.

NYSDOH uses eMedNY to process Medicaid claims and payments for services. *See* N.Y. Soc. Serv. Law § 367-b(1)(c). Specifically, eMedNY "[r]eceives, reviews and pays claims submitted by the providers of health care for services rendered to eligible patients (enrollees)."[2] Claims in eMedNY may be paid, pended, or denied. *See* N.Y. Soc. Serv. Law § 367-b(8)(b)(1) (requiring prior to payment a "review for proper coding and such other review as may be deemed necessary"); N.Y. Comp. Codes R. & Regs. tit. 18, § 504.8(c) (delineating prepayment review that "may deny claims, adjust claims to eliminate noncompensable items . . . correct . . . errors,

---

[2] eMedNY Provider Manual, Information for All Providers, Introduction, "Medicaid Management Information System," version 2011-1 (June 1, 2011), *available at*
https://www.emedny.org/providermanuals/allproviders/PDFS/Information_for_All_Providers-Introduction.pdf.

3

pend claims for further audit or review, or approve the claim for payment").

LDSSs play a role in approving coverage of certain services that under State law are subject to a "prior approval" or "prior authorization" requirement.[3] When required, prior approval and prior authorization must be completed before a provider may submit a claim for services—a claim may be denied if prior approval and/or prior authorization were not completed or were denied for the service.[4]

### B.     *The Second Amended Complaint*[5]

Since October 5, 2006, Gelbman has worked as an "Information Specialist II" at NYSDOH. (Doc. 52 ("SAC") ¶ 4.) Gelbman's employment duties and responsibilities include, among other things, performing business and systems analysis for eMedNY. (*Id.* ¶¶ 5, 12.) He also consults on strategies for program implementation and verification, evaluates project design proposals and project assessments, and models business processes for eMedNY. (*See id.* ¶ 5.) In 2014, while still employed by NYSDOH, Gelbman filed a complaint under seal in this case alleging several violations of the FCA.

Relator alleges that the City presented, or caused to be presented, Medicaid claims to the United States, "which it knew where legally and factually false." (*Id.* ¶ 13.) To support this allegation, Relator identifies meetings called "Evolution Project Meetings" that Relator participated in from 2006 through 2015, during which the meeting participants—including representatives from the City and NYSDOH—"conspired to manipulate and rig the manner in

---

[3] *See* eMedNY Provider Manual, Information for All Providers – General Policy, "Prior Approval," "Prior Authorization," version 2011-2 (Oct. 20, 2011), *available at* https://www.emedny.org/ProviderManuals/AllProviders/PDFS/Information_for_All_Providers-General_Policy.pdf.

[4] *See supra* note 3.

[5] The following factual summary is drawn from the allegations of the second amended complaint unless otherwise indicated, which I assume to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

4

which Medicaid claims . . . were processed by eMedNY." (*Id.*) The Evolution Project Meetings occurred as often as two to three times per week. (*Id.* ¶ 82.) Gelbman's co-workers and supervisors were present at these meetings. (*Id.*) When Gelbman asked his supervisors why certain Medicaid claims were being paid despite not meeting the requisite criteria, his supervisors explained that the City would face "financial ruin" and "political problems [in] the administration." (*Id.* ¶ 90.)

The SAC describes examples of five types of false claims the City allegedly caused the State to pay, and to then submit to the United States for reimbursement. These types include "untimely" claims, (*id.* ¶¶ 103–08), claims involving "failure to present valid prior approval," (*id.* ¶¶ 109–19), "duplicative claims," (*id.* ¶¶ 120–28), "provider ineligible" claims, (*id.* ¶¶ 129–34), and claims where "other insurance paid" or "Medicare paid," (*id.* ¶¶ 135–42). For each type of claim, Relator provides at least one "exemplar claim," which includes payment information such as dates, amounts, and the edit codes used in eMedNY.

Relator also alleges a relationship between the City and its public hospitals, all of which are owned by HHC. (*Id.* ¶ 16.) Part of this relationship included substantial financial assistance that the City provided to HHC, averaging almost $300 million per year. (*Id.*) HHC owns or indirectly owns certain of the City's medical providers, "which were in significant measure dependent upon receiving funds" for Medicaid claims from the United States. (*Id.* ¶ 95.) Through this relationship, "regulations were systematically and routinely breached" by both Defendants. (*Id.* ¶¶ 78, 102.)

## II. Procedural History

On February 6, 2014, Relator filed a complaint under seal pursuant to the *qui tam* provisions of the FCA, which permit a private person to file an action on behalf of the

5

Government. The Government declined to intervene in the action. (Doc. 34.)

On April 10, 2017, Relator amended his complaint, (Doc. 39), and the City moved to dismiss the amended complaint, (Doc. 44). With leave from the Court, Relator filed the SAC, (Doc. 52), adding HHC as a party, and the City's motion to dismiss the amended complaint was dismissed as moot with leave to re-file, (Doc. 51).

On September 19, 2017, the City filed its motion to dismiss the SAC, (Doc. 57), and memorandum of law in support of its motion, (Doc. 58). On October 17, 2017, the Government requested leave to file a statement of interest ("SOI"), (Doc. 68), which I granted, (Doc. 70). On November 1, 2017, Relator filed his opposition to the City's motion, (Doc. 73), and supporting declaration and exhibits, (Doc. 74). The Government filed its SOI on November 8, 2017. (Doc. 76.) On December 15, 2017, the City filed its reply. (Doc. 79.)

On November 11, 2017, I held a pre-motion conference in connection with HHC's motion to dismiss the SAC, at which point I granted HHC leave to file its motion. On January 12, 2018, HHC filed its motion to dismiss the SAC, (Doc. 82), and memorandum of law in support of its motion, (Doc. 83). On February 22, 2018, Relator filed his opposition to HHC's motion, (Doc. 84), and supporting declaration and exhibits, (Doc. 85). On March 23, 2018, HHC filed its reply. (Doc. 86.)

### III. Legal Standards

#### A. *Rule 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *See Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

**B.** *Rule 9(b)*

Because the FCA is an anti-fraud statute, *qui tam* complaints filed under the FCA must also comply with Rule 9(b) of the Federal Rules of Civil Procedure, which requires a plaintiff to plead fraud claims "with particularity." Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am.*

7

*Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) ("*Chorches*") (quoting *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)). "Rule 9(b) does not require that every *qui tam* complaint provide details of actual bills or invoices submitted to the government." *Id.* at 93. However, "the complaint must be supported by more than 'conclusory statements' or 'hypotheses,' and it must set forth 'particularized allegations of fact.'" *United States ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d Cir. 2017) (summary order) (quoting *Ladas*, 824 F.3d at 26–27). Although Rule 9(b) permits scienter to be asserted generally, the Second Circuit has "repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." *Id.* (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (observing that the FCA's scienter requirement is "rigorous").

## IV. Discussion

### A. *The Declarations of Richard P. Billera*

Relator submits the declarations of Richard P. Billera[6] in support of his oppositions to Defendants' motions to dismiss ("Billera Declarations"). (Docs. 71-1, 85.) The Billera Declarations, and their contents, are entirely extrinsic to the SAC, were created specifically for this litigation, and Relator has offered no credible basis on which I may consider them. Indeed, Relator himself concedes that "evidence from extrinsic sources is typically not to be used to oppose" a motion to dismiss. (Opp. City 5.)[7] Despite conceding the legal standard upon which

---

[6] Billera is the Vice President and Chief Financial Officer of Ranejane, LLC, a company that, among other things, "provides consulting services to providers and contractors in dealing with Medicaid and Medicare claims, and in particular, claims involving the New York State Department of Health, and the United States Department of Health and Human Services." (Doc. 71-1 ¶ 1.)

[7] "Opp. City" refers to Relator's Memorandum of Law in Opposition to the Defendant City of New York's Motion to Dismiss the Second Amended Complaint, filed November 1, 2017. (Doc. 73.)

motions to dismiss are evaluated, Realtor asserts that this case is unique and he should be permitted to submit extrinsic evidence "to demonstrate a lack of implausibility," and that the Billera Declarations are "integral" to the SAC. In considering a motion to dismiss, I look to the allegations on the face of the complaint. *See supra* Part III.A. Relator's claims that the Billera Declarations should be deemed "integral" to the SAC are baseless, since Relator neither (1) had actual notice of the Billera Declarations, nor (2) relied upon them in framing the SAC—indeed, the Billera Declarations—specifically created as part of Relator's opposition to the motion to dismiss—did not exist at the time that the SAC was drafted. *See Chechele v. Scheetz*, 819 F. Supp. 2d 342, 347 (S.D.N.Y. 2011). The Billera Declarations fail to satisfy any of the exceptions that would permit me to consider them in deciding the pending motions, and I will disregard them.

### B. *The FCA*

Relator alleges that Defendants violated the FCA by (1) presenting, or causing to be presented, false claims (in violation of 31 U.S.C. § 3729(a)(1)(A)); (2) making or using a false record or statement (in violation of § 3729(a)(1)(B)); (3) conspiring to submit or cause to be submitted a false claim or to make or use a false record or statement (in violation of § 3729(a)(1)(C)); and (4) making a false claim in order to avoid paying the Government—a so-called "reverse false claim" (in violation of § 3729(a)(1)(G)). (SAC ¶¶ 167–86.) Because the SAC fails to plausibly allege any type of false claim under the FCA and falls short of the pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure, the SAC must be dismissed in its entirety.

#### 1. Applicable Law

The FCA imposes liability for, among other things, "knowingly" presenting or causing to

be presented, a false or fraudulent claim "for payment or approval." 31 U.S.C. § 3729(a). Although Congress has repeatedly amended the FCA, "its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Escobar*, 136 S. Ct. at 1996. A "claim" includes direct requests to the Government for payment as well as claims for reimbursement under federal benefits programs. *Id.* Pursuant to the private, or *qui tam*, provisions of the FCA, a private person may bring a civil action on behalf of the Government, as a "relator," for violations of each act. 31 U.S.C. § 3730(b). If a relator brings such an action under the FCA, the Government may elect, within a set amount of time, to intervene in the action. 31 U.S.C. § 3730(b)–(c).

To prove a false claim under FCA §§ 3729(a)(1)(A) and 3729(a)(1)(B), a relator must show that the defendant "(1) made a claim, (2) to the [ ] government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016) (quoting *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001)), *abrogated on other grounds by Escobar*, 136 S. Ct. 1989. Under the FCA, "claims" include "direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Escobar*, 136 S. Ct. at 1996. In order to demonstrate that a defendant acted knowingly, the relator must prove that the defendant had actual knowledge, acted in deliberate ignorance, or acted in reckless disregard of the falsity of the claims being submitted. *See* 31 U.S.C. § 3729(b)(1)(A).

a. <u>Factually False Claims</u>

Under the FCA, claims are either "factually" false or "legally" false. The typical FCA claim is a factually false claim and "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Mikes*, 274 F.3d

at 697. A factually false claim may also be based on fraudulent inducement. This type of factually false claim alleges that the defendant made fraudulent representations to the Government to induce it to enter a contract, and although no false statements were made at the time of the actual claims for payment, they too are "actionable false claims" because the claims "derived from the original fraudulent misrepresentation." *United States ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 468 (5th Cir. 2009)).

### b. Legally False Claims

A legally false claim, meanwhile, is "predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term." *Mikes*, 274 F.3d at 696. There are two types of legally false claims: (i) express false certification claims and (ii) implied false certification claims. Express false certification occurs where "a party certifies compliance with a statute or regulation as a condition to governmental payment, but is not actually compliant." *Bishop*, 823 F.3d at 43 (internal quotation marks omitted). Implied false certification occurs "where the submission of the claim itself is fraudulent because it impliedly constitutes a certification of compliance." *Id.* A theory of implied false certification can be a basis for liability where two conditions are satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001.

For a relator to state an FCA claim under a legally false theory, he must show that the misrepresentation about compliance is "material" to the Government's decision to pay. *Id.* at

11

2002–03 (explaining that this is because the FCA is not intended to be "'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations" (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008))). In order to be material, the misrepresentation must "hav[e] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 1996 (quoting 31 U.S.C. § 3729(b)(4)). The Supreme Court has explained that materiality is a "demanding" standard that requires a holistic assessment. *Id.* at 2003. Provisions are "not automatically material, even if they are labeled conditions of payment." *Id.* at 2001. For example, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 2003. Conversely, where "a reasonable person would realize" that the misrepresentation concerned an "imperative" aspect of the good or service, "a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out." *Id.* at 2001–02.

c. Reverse False Claims

To state a "reverse false claim" under § 3729(a)(1)(G), a relator must show: "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government—a duty to pay money or property." *United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 367 (S.D.N.Y. 2014) (internal quotation marks omitted). "Subsection (a)(1)(G) is referred to as the 'reverse false claims' provision because 'it covers claims of money owed to the government, rather than payments made by the government.'" *Id.* at 368 (quoting *United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063 (EBB), 2000 WL 1336487, at *10 (D. Conn. Aug. 24, 2000)).

12

## 2. Application

### a. Factually False Claims

Relator fails to plausibly allege that Defendants submitted factually false claims for payment. The SAC merely alleges that "the City of New York and HHC knowingly submitted . . . factually false claims." (SAC ¶¶ 13, 48, 81, 150.) These allegations are the only allegations in the SAC that even mention a factually false claim, and they are entirely conclusory. To plead factual falsity, a relator must allege that a billed for service was either not provided or not described truthfully. *Mikes*, 274 F.3d at 697; *see also United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 313–14 (S.D.N.Y. 2011) (finding that plaintiff failed to state a claim under the factual falsity theory where it did not allege that the provider submitted claims for a falsified service or "for services rendered to fictitious patients"). Despite identifying a number a types of allegedly false claims, (*see, e.g.*, SAC ¶¶ 103–42), Relator does not identify a single claim relating to a service that was not provided or not truthfully described. Any claims based on a theory that either the City or HHC submitted factually false claims for payment is therefore dismissed.

### b. Legally False Claims – Express Certification

Relator similarly fails to plausibly allege that Defendants submitted legally false claims under an express certification theory. As an initial matter, the SAC does not distinguish between the legal standards governing implied and express certifications, nor does it specify which theory is being pursued.[8] Instead, the SAC alleges that "by virtue of their expressed [sic] and implied certification that these claims were in compliance with applicable federal and state Medicaid

---

[8] Relator's oppositions likewise fail to delineate between the legal standards governing implied and express certifications. While Relator is certainly correct that he is "permitted to allege both expressed [sic] and implied certification," (Opp. City 17), it does not follow that he need not respond to Defendants' separate arguments asserted under each legal standard.

13

law" the City submitted false claims to the Government. (SAC ¶ 40.) This lack of clarity alone is a basis to dismiss the legally false claims. *See United States v. N.Y. Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 07 Civ. 292(PKC), 2014 WL 3905742, at *17 (S.D.N.Y. Aug. 7, 2014) (providing basis for dismissal of legally false claims where the complaint merely alleged that defendants "either expressly or impliedly submitted false legal certifications").

Further, neither the SAC nor Relator's oppositions point to any certification that could serve as a basis for an express certification claim. Although the Second Circuit recently held that an alleged express certification need not certify compliance with a "particular" statute or regulation, *Bishop*, 870 F.3d at 106–07, such a claim must nevertheless plead an actual certification that was either (1) signed by the defendant or (2) caused to be signed because of the false claims alleged in the complaint. The SAC only describes one certification—the Form CMS-64—a form that by Relator's own admission is not required to be signed by the City or HHC.[9] (SAC ¶ 35 ("Form CMS-64 Certification requires the executive officers of the state agency (in this case NYSDOH) to certify . . . .").) Moreover, the Form CMS-64 attached to the SAC is blank and unsigned. (SAC Ex. A.) Because the SAC fails to plausibly allege that either Defendant certified compliance with a statute or regulation as a condition to governmental payment, Relator fails to state a claim under an express certification theory. *See United States ex*

---

[9] In its SOI, the Government asserts, correctly, that it would be sufficient for the SAC to plausibly allege that the City caused the submission of false claims, rather than submitting the claims itself. (SOI 7–8); *see also United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 819 (S.D.N.Y. 2017) ("Where the defendant is a non-submitting entity, courts merely ask 'whether that entity knowingly caused the submission of either a false or fraudulent claim or false records or statements to get such a claim paid. The statute makes no distinction between how non-submitting and submitting entities may render the underlying claim or statements false or fraudulent.'" (quoting *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 389 (1st Cir. 2011)), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018). Relator, however, does not allege that the City or HHC caused the submission of false claims: the SAC does not provide any non-conclusory facts to connect either of Defendants to the claims that the providers submitted for payment.

14

*rel. Hussain v. CDM Smith, Inc.*, No. 14-CV-9107 (JPO), 2017 WL 4326523, at *6 (S.D.N.Y. Sept. 27, 2017) ("Without an express certification, there is no express certification claim.").

### c. Legally False Claims – Implied Certification

Relator's legally false claims also fail under an implied certification theory. The City argues, among other things, that the SAC does not plausibly allege that (1) the City submitted, or caused the submission of, any false claims; (2) the underlying provider claims were false; and (3) the edits were material to the Government's decision to pay the claims. (City Mem. 14–19.)[10] HHC argues, among other things, that the SAC fails to differentiate between the City and HHC, and it therefore fails to plausibly allege that HHC participated in a scheme to defraud the Government. (HHC Mem. 9–11.)[11]

The crux of Relator's allegations is that certain edit codes (*e.g.*, "untimely claims," "lack of prior approval," "duplicative claims," "provider ineligible," "other insurance paid/Medicare paid") were applied to claims that various New York City medical providers submitted to Medicaid. Putting aside Defendants' argument that it is the State—not the City or HHC—that plays a role in submission of these claims, the SAC utterly fails to meet the pleading standards under Rules 12(b)(6) and 9(b). Although Relator provides details and descriptions of the edit codes themselves, he fails to allege how the existence of an edit rendered the claim false or why the claim was not ultimately entitled to payment. For example, the SAC does not allege that the edit code was still on the claim when the claim was paid. The SAC does not allege that the provider did not correct the alleged error before resubmitting the claim, and it does not allege

---

[10] "City Mem." refers to the Memorandum of Law in Support of Defendant the City of New York's Motion to Dismiss the Second Amended Complaint of Relator Andrew Gelbman, filed September 19, 2017. (Doc. 58.)

[11] "HHC Mem." refers to the Memorandum of Law in Support of Defendant New York City Health and Hospitals Corporation's Motion to Dismiss the Second Amended Complaint of Relator Andrew Gelbman, filed February 22, 2018. (Doc. 83.)

15

any facts about the conduct that led the edit to occur (*e.g.*, that a medical provider was ineligible, who the provider was, instances of duplicate billing, who applied the edit code to the claim, etc.). Instead, the SAC incorporates the assumption that the edit codes themselves indicate that a claim was submitted "in violation of state and federal laws." (*See, e.g.*, SAC ¶¶ 41, 43.) This conclusory allegation, even when coupled with detail about the edit codes and exemplar claims, is insufficient to state a claim for fraud with particularity under Rule 9(b).

Because the SAC fails to plausibly allege that either Defendant failed to comply with a legal or contractual requirement, Relator fails to state a claim under an implied certification theory.

### d. Reverse False Claims

Nor do the allegations in the SAC plausibly allege any so-called "reverse false claims" under the FCA. In support of his reverse false claims, Relator alleges that various providers of health services billed for and received benefits that were "in the form of overpayments known to Defendants." (SAC ¶¶ 182–83.) The SAC, however, is devoid of any factual information to suggest that either Defendant owed a financial obligation to the Government. Relator's reverse false claim allegations—which essentially boil down to various providers allegedly receiving payment on false claims and thus retaining Government funds to which they were not entitled—are not an adequate basis on which to allege a reverse false claim. *See CDM Smith, Inc.*, 2017 WL 4326523, at *9 ("A complaint that 'makes no mention of any financial obligation that the defendant owed to the government' and 'does not specifically reference any false records or statements used to decrease such an obligation' must be dismissed." (quoting *Allergan, Inc.*, 246 F. Supp. 3d at 826)).

Contrary to Relator's arguments, the Second Circuit's opinion in *Chorches* does not alter

this result. In *Chorches*, the bankruptcy estate of a medical technician brought an FCA claim against an ambulance company. *Chorches*, 865 F.3d at 75. The Second Circuit allowed the case to proceed even though the relator had "not identified actual invoices that were submitted to the federal government" because "the particular bills that were submitted for reimbursement [were] peculiarly within [the defendant's] knowledge." *Id.* at 82 (internal quotation marks omitted). The Second Circuit held that the relator's claims were sufficient because he intricately detailed the "time period . . . during which the fraudulent scheme took place" as well as the "dates, both precise and approximate" of false claims and even "patient names" included in fraudulent bills. *Id.* at 83–84. All that the relator lacked was proof that the fraudulent bills had actually been submitted—*i.e.*, the "specific documents containing false claims"—which he did not have access to given the program at issue. The Second Circuit made clear, however, that pleading "on information and belief" still requires adducing "specific facts supporting a strong inference of fraud." *Id.* at 82 (internal quotation marks omitted).

Relator, relying on *Chorches*, argues that he provides "an enormous amount of final claims detail." (Opp. HHC 23.)[12] Alleging an enormous amount of detail about the edit codes, however, does not equate to a plausible reverse false claim, which requires "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government—a duty to pay money or property." *Novartis Pharm. Corp.*, 43 F. Supp. 3d at 367 (internal quotation marks omitted). Relator does not point to any allegations in the SAC that support either of these requirements. Accordingly, Defendants'

---

[12] "Opp. HHC" refers to Relator's Memorandum of Law in Opposition to the Defendant HHC's Motion to Dismiss the Second Amended Complaint, filed February 22, 2018. (Doc. 84.)

motions are also granted as to the reverse false claims.[13]

### C. *Leave to Amend*

In the event of dismissal of the SAC, Relator requests leave to amend the SAC. (Opp. City 24.) However, the SAC is the third complaint filed by Relator in this matter. Indeed, Relator was granted leave to amend his complaint in response to the City's previously filed motion to dismiss. (*See* Doc. 51.) Courts may deny leave to amend in cases of, among other things, "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and/or] futility of amendment." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted). Here, I find that Relator's repeated failures to cure deficiencies, including after the filing of the City's initial motion to dismiss, warrant dismissal of his claims with prejudice. Accordingly, Relator's claims are dismissed with prejudice.

---

[13] Because the SAC only alleges a conspiracy in connection with the edit code scheme, there is no need to determine whether plaintiff has sufficiently alleged the elements of a conspiracy. *See United States ex rel. Mooney v. Americare, Inc.*, No. 06-CV-1806 (FB)(VVP), 2013 WL 1346022, at *6 (E.D.N.Y. Apr. 3, 2013).

## V. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED and Relator's claims are dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 57, 82), enter judgment for Defendants, and close this case.

SO ORDERED.

Dated: September 30, 2018
     New York, New York

*Vernon Broderick*
Vernon S. Broderick
United States District Judge