Case 1:14-cv-00771-VSB Document 95 Filed 11/08/19 Page 1 of 9
Case 1:14-cv-00771-VSB Document 80-1 Filed 12/08/19 Page 1 of 9

MANDATE
18-3162
*Gelbman v. City of New York*

1:14-cv-00771-VSB

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of October, two thousand nineteen.

PRESENT:
    PIERRE N. LEVAL,
    SUSAN L. CARNEY,
        *Circuit Judges*,
    TIMOTHY C. STANCEU,
        *Judge*.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Nov 08 2019

---

UNITED STATES OF AMERICA, EX REL.
ANDREW GELBMAN,

    *Plaintiff-Appellant*,

    v.    No. 18-3162

CITY OF NEW YORK, NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION,

    *Defendants-Appellees.*

---

FOR PLAINTIFF-APPELLANT:    BRIAN J. ISAAC, Pollack Pollack Isaac & DeCicco, LLP, New York, NY (Richard

---

* Chief Judge Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation.

|   |   |
|---|---|
|   | B. Ancowitz, Law Office of Richard B. Ancowitz, Albany, NY, *on the brief*). |
| FOR DEFENDANTS-APPELLEES: | JOSEPH V. WILLEY (Alan J. Brudner, *on the brief*), Katten Muchin Rosenman LLP, New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Broderick, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on September 30, 2018, is **AFFIRMED**.

Plaintiff-Appellant Andrew Gelbman appeals from the judgment of the District Court (Broderick, *J.*), dismissing his *qui tam* complaint filed under the False Claims Act (the "FCA"), 31 U.S.C. § 3729 *et seq.*, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and failure to plead fraud with particularity under Rule 9(b). We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm.

Gelbman alleges that the City of New York (the "City") and the Health and Hospitals Corporation ("HHC") (collectively, "Defendants-Appellees") submitted false claims to the United States government for reimbursement under the Medicaid program.[1] The second amended complaint (the "SAC") sets forth the following factual allegations relating to the alleged fraudulent scheme, which we take as true for the purposes of evaluating a motion to dismiss.

To obtain Medicaid reimbursements from the federal government, health care providers that operate within the City's jurisdiction submit their Medicaid claims to the City's Human Resources Administration (the "HRA"). HRA, in turn, relays these claims to

---

[1] The Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*, established a cooperative federal-state program designed to provide medical assistance to low-income individuals.

2

the New York State Department of Health (the "NYSDOH"), the state agency charged with administering New York's state Medicaid plan.

NYSDOH then uses eMedNY—an automated computer screening system that was "design[ed] and program[ed]" by New York State—to determine whether a claim is reimbursable under Medicaid. App'x 34. Specifically, eMedNY runs the claims through a series of computer algorithms, called "edits," that classify each claim according to various characteristics that are relevant to billing and reimbursement. App'x 33. Based on these computer edits, eMedNY determines whether to pay or deny a claim. If the eMedNY system applies an "edit" indicating that a claim is flawed or otherwise ineligible, the provider is informed of the issue and has an opportunity to cure the error and resubmit the claim. The provider may also argue that the "edit" was applied in error or request an exception to the denial. *See* New York State Department of Health, New York State Electronic Medicaid System Remittance Advice Guideline 106-07 (2013).

NYSDOH then submits the paid claims, as determined by eMedNY, to the United States for reimbursement of the federal government's share of Medicaid expenditures. It does so through a CMS-64 Quarterly Expense Report (the "Expense Report") that, *inter alia*, certifies to the United States that "[t]his report only includes expenditures under the Medicaid program . . . that are allowable in accordance with applicable implementing federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary." App'x 60.

Gelbman asserts, however, that Defendants-Appellees and NYSDOH have "conspired to manipulate and rig the manner in which Medicaid claims . . . [are] processed by eMedNY," such that claims that were flagged by eMedNY as ineligible for reimbursement under state or federal law are nevertheless being submitted to the federal government. App'x 23. Gelbman learned of the alleged fraudulent scheme through his employment as an "Information Specialist II" at NYSDOH, where he performed work on eMedNY, including "Medicaid management and fraud detection." App'x 21, 33. Gelbman alleges that, during various meetings held between the City and NYSDOH, certain unnamed HRA representatives "averred . . . that policy considerations warranted the improper manipulation

3

of edits by [NYSDOH]," and that as a result of these meetings, Defendants-Appellees and NYSDOH manipulated the eMedNY system to ensure that certain ineligible claims were paid and submitted for reimbursement "so as to benefit the [City]." App'x 37. When Gelbman asked why certain Medicaid claims were being paid even though they were ineligible for reimbursement under state or federal law, his supervisors at NYSDOH explained that failure to do so would lead to "financial ruin" for the City's health care providers and "political problems" for the City. App'x 38.

Gelbman also alleges that he discovered "files and records" showing that the United States government had reimbursed the City on claims that eMedNY had, at some point in time, identified as (1) "untimely," (2) "submitted without proper prior authorization," (3) "duplicative," (4) submitted by providers who were not properly enrolled in the Medicaid program, or (5) had already been paid by another insurer or by Medicare. App'x 24, 41-48, 53-54. For each category of claims, the SAC identifies the laws that allegedly render the claim ineligible, as well as provides detailed payment information for more than 80 individual "exemplar" claims. App'x 41. Gelbman estimates that, from 2009 through 2015, the submission of these five types of Medicaid claims has resulted in the federal government overpaying the City by more than $14 billion in Medicaid reimbursements.

In February 2014, Gelbman filed suit on behalf of the United States under the *qui tam* provisions of the FCA. Gelbman asserts four FCA claims against Defendants-Appellees for (1) presenting a false claim, in violation of 31 U.S.C. § 3729(a)(l)(A); (2) making or using a false record or statement material to a false claim, in violation of § 3729(a)(l)(B); (3) conspiring to violate the FCA, in violation of § 3729(a)(l)(C); and (4) making or using a false record to avoid an obligation to pay the federal government (*i.e.*, a "reverse false claim"), in violation of § 3729(a)(l)(G). The United States declined to intervene in the action.

Defendants-Appellees sought dismissal of the SAC under Rule 12(b)(6) for failure to state a claim and under Rule 9(b) for failure to allege fraud with particularity. The District Court granted Defendants-Appellees' motion; denied Gelbman's request for leave to further amend his complaint; and dismissed the action with prejudice. Gelbman now appeals the District Court's dismissal of the SAC, but not its denial of leave to amend. For the reasons

4

set forth below, we affirm the District Court's dismissal, primarily for the SAC's failure to satisfy Rule 9(b).

1. 31 U.S.C. §§ 3729(a)(l)(A), (B), and (C)

Gelbman's counts under §§ 3729(a)(l)(A), (B), and (C) of the FCA are subject to Rule 9(b), *see United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016), which requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). We review *de novo* the dismissal of a complaint on Rule 9(b) grounds, *Ladas*, 824 F.3d at 26, taking as true a plaintiff's well-pleaded factual allegations, *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017).

To satisfy Rule 9(b)'s particularity standard, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Chorches*, 865 F.3d at 81 (citation omitted). We have "rigorously" enforced Rule 9(b), recognizing that the rule has a number of "salutary purposes," including (1) "provid[ing] a defendant with fair notice of a plaintiff's claim," (2) "safeguard[ing] a defendant's reputation from improvident charges of wrongdoing," and (3) "protect[ing] a defendant against the institution of a strike suit." *Ladas*, 824 F.3d at 25-26.

In dismissing the SAC, the District Court focused on Gelbman's failure to provide details about the eligibility status of the Medicaid claims *at the time* of their submission to the federal government. As the District Court noted, and as Gelbman does not dispute, the SAC assumes that NYSDOH submitted claims to the federal government that were ineligible for Medicaid reimbursement because these claims had, at some point prior to their submission, been flagged as ineligible by eMedNY. This assumption, however, presupposes a number of conditions. To begin, eMedNY's identification of a claim as ineligible might, itself, have been an error that NYSDOH later discovered and corrected. Alternatively, the health care providers might have corrected the underlying problem before submission. Moreover, because Gelbman fails to identify the specific Expense Reports that NYSDOH *actually* submitted to the federal government, the SAC leaves open the possibility that NYSDOH

5

fully disclosed to the United States any potential defects in the claims submitted for reimbursement.[2] *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996, 2003 (2016) (holding that "[a] misrepresentation" about a claim's compliance with the law "must be material to the Government's payment decision in order to be actionable under the [FCA]," and that the Government's payment of "a particular claim in full despite its actual knowledge that certain requirements were violated . . . is very strong evidence that those requirements are not material").

Of course, a *qui tam* complaint need not always allege, based on personal knowledge, the actual submission of false claims to the federal government. As we explained in *Chorches*, to survive dismissal under Rule 9(b) when the complaint pleads only on information and belief that fraudulent claims were actually submitted to the United States, a plaintiff must (1) "make plausible allegations that the bills or invoices actually submitted to the government were uniquely within [the defendant's] knowledge and control," and (2) "adduce specific facts supporting a strong inference of fraud." *Chorches*, 865 F.3d at 83 (internal quotation marks omitted).

Gelbman does neither in this case. The SAC does not "set[] forth facts establishing specific reasons why [the] information [contained in] the particular bills that were submitted for reimbursement is peculiarly within [Defendants-Appellees'] knowledge." *Id.* at 82 (internal quotation marks and alterations omitted). This omission is particularly noteworthy in light of Gelbman's position as an Information Specialist working on Medicaid reimbursement at NYSDOH, the agency responsible for submitting Medicaid claims to the federal government. Nor does the *qui tam* complaint "put[] forth particularized allegations of a scheme to falsify records" or "describe[] specific instances of the implementation of that scheme." *Id.* at 84. Instead, Gelbman alleges in a conclusory fashion that his superiors at NYSDOH "conspired" with an unknown number of unidentified "HRA representatives" to "manipulate and rig" eMedNY. App'x 23, 37. Gelbman does not detail how eMedNY was

---

[2] Gelbman attaches to the SAC a blank, unsigned Expense Report that contains no information on the claims that Gelbman asserts were false.

6

rigged (*e.g.*, by altering eMedNY's computer algorithms, or by making post-hoc adjustments to eMedNY payment determinations), or who carried out the rigging (*e.g.*, NYSDOH employees, City employees, or some unknown third party). As a result, we are left to speculate as to the specific design and implementation of a scheme that purportedly defrauded the federal government of more than $14 billion over the course of six years.

Gelbman's complaint therefore bears no more than the remotest resemblance to the *qui tam* complaint at issue in *Chorches*, a case that he relies on heavily. In that case, we considered whether Chorches—the trustee for the bankruptcy estate of Fabula, a medical technician—had alleged with sufficient particularity that the defendant, an ambulance company, falsified patient care reports so that they would qualify for Medicare reimbursement. *Chorches*, 865 F.3d at 75-78. Although Chorches failed to identify actual invoices submitted by the defendant to the federal government, we nevertheless allowed his FCA claims to proceed. *Id.* at 82, 93. In doing so, however, we emphasized that the *qui tam* complaint's factual allegations showed that the defendant's "billing procedures . . . made it virtually impossible for most employees to have access to all the information necessary to certify on personal knowledge both that a particular invoice was submitted for payment and that the facts stated to justify the invoice were false." *Id.* at 82. We further concluded that "[the] allegations detail specific and plausible facts from which we may easily infer . . . that [the defendant] systematically falsified its records," noting in particular that the complaint named the "supervisory personnel" who directed the falsification of the reports; identified more than ten specific instances in which Fabula was ordered to fabricate documents; and explained in detail "both the scheme itself and the method by which [the defendant] executed the scheme." *Id.* at 77, 83-84. In light of Chorches's "plausible and particularized allegations," we concluded that his complaint survived dismissal under Rule 9(b). *Id.* at 85-86.

Gelbman, by contrast, offers no such detail, either as to his reasons for not having personal knowledge of the contents of the Expense Reports submitted to the federal government, or as to the contours of the Defendants-Appellees' alleged scheme to rig and manipulate eMedNY. Instead, his FCA claims under §§ 3729(a)(l)(A), (B), and (C) rest on

Case 18-2077, Document 84, 11/19/19, 2712582, Page 8 of 9

"speculation and conclusory allegations." *Id.* at 86 (citation omitted). We therefore affirm dismissal for failure to satisfy Rule 9(b)'s particularity standard.

2. 31 U.S.C. § 3729(a)(l)(G)

We have also applied Rule 9(b)'s heightened pleading standard to *qui tam* actions brought under § 3729(a)(l)(G) for reverse false claims. *See United States ex rel. Takemoto v. Nationwide Mut. Ins. Co.*, 674 F. App'x 92, 95 n.1 (2d Cir. 2017) (collecting cases); *see also Olson v. Fairview Health Servs. of Minnesota*, 831 F.3d 1063, 1074 (8th Cir. 2016) ("[I]t would be remarkable if relators could escape Rule 9(b)'s heightened pleading requirements for fraud by seeking recovery through subsection (a)(1)(G)."). Section 3729(a)(1)(G) prohibits a person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." Accordingly, a claim under § 3729(a)(l)(G) requires the plaintiff to establish that the defendant had a financial obligation to the federal government.

Gelbman's reverse false claim theory thus fails for the same reason that his other FCA claims fail. As expressed above, the SAC does not plausibly allege that Defendants-Appellees caused the submission of false claims to the federal government. Accordingly, the SAC does not plausibly allege that Defendants-Appellees had any obligation to repay to the federal government any funds it received, directly or indirectly, as a result of the Medicaid claims it submitted to NYSDOH.

We therefore conclude that dismissal of Gelbman's reverse false claims action was warranted under Rule 9(b). *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (dismissing reverse claims theory because the relators "have not identified in their complaint any concrete obligation owed to the government").

\* \* \*

We have considered Gelbman's remaining arguments and conclude that they are without merit. Accordingly, the District Court's judgment is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

9

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit